IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>A SAMSUNG CELLULAR TELEPHONE, MODEL SM-S111DL(G8), BEARING FCC ID ZCASMS111DL,<br><br>CURRENTLY LOCATED AT THE FBI – KANSAS CITY DIVISION EVIDENCE CONTROL ROOM, 1300 SUMMIT STREET, KANSAS CITY, MISSOURI 64105. | Case No. 22-SW-2182-DPR |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Stacy Lee Moore, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), United States Department of Justice ("DOJ"), and I am currently assigned to the Joplin, Missouri, Resident Agency of the FBI's Kansas City, Missouri, Division. As such, I am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

2. As part of my duties with FBI, I investigate criminal violations of Title 18 of the United States Code, including violations of 18 U.S.C. § 1201(a), kidnapping resulting in death, and § 3, that is, accessory after the fact to kidnapping resulting in death.

3. The statements in this affidavit are based on my personal observations, training and experience, investigation of this matter, and information obtained from other agents and witnesses. Because this affidavit is being submitted for the limited purpose of securing a search warrant, this affiant has not included each and every fact known to me concerning this investigation.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. This affiant has set forth the facts necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1201(a) and 3, kidnapping resulting in death and accessory after the fact to kidnapping resulting in death, are contained within the following electronic device – a **Samsung cellular telephone, model SM-S111DL(G8), bearing FCC ID ZCASMS111DL** ("Target Device"), which was seized by law enforcement on November 3, 2022. The Target Device is currently stored at the FBI - Kansas City Division Evidence Control Room, Kansas City, Missouri.

5. This affidavit is in support of an application for a search warrant for evidence, fruits, and instrumentalities of the foregoing criminal violations, which relate to the offenses of kidnapping resulting in death and accessory after the fact to kidnapping resulting in death. The property to be searched is described in the following paragraphs and fully in Attachment A. This affiant requests the authority to search and/or examine the seized items, specified in Attachment B, as instrumentalities, fruits, and evidence of crime.

6. The applied-for warrant would authorize the forensic examination of the device for the purpose of identifying electronically stored data particularly described in Attachment B.

7. This affiant has probable cause to believe that evidence of violations of 18 U.S.C. §§ 1201(a) and 3, is located in and within the aforementioned property described below. Thus, as outlined below, and based on my training and experience, there is probable cause to believe that evidence, fruits, and/or instrumentalities of the aforementioned crimes are located in this property.

## PROBABLE CAUSE

8. On October 31, 2022, at approximately 6:30 p.m., Ashley Bush (Ms. Bush) was reported as a missing person to the Benton County, Arkansas Sheriff's Office by her fiancé, Joshua

Willis (Mr. Willis). Mr. Willis reported that he had last seen Ms. Bush in the passenger seat of an older model, tan pickup truck on October 31, 2022, at the intersection of Highway 72 and Highway 43 in Maysville, Arkansas. Mr. Willis described the driver of the vehicle as a white female in her 40's, with shoulder length brown hair, whom Mr. Willis knew as "Lucy." Mr. Willis advised that Ms. Bush was approximately 31 weeks pregnant.

9. Mr. Willis informed Benton County Sheriff's Office investigators that on October 28, 2022, he and Ms. Bush met "Lucy" at the Gravette, Arkansas, public library. "Lucy" was driving the same older model tan pickup truck he had observed her in on October 31, 2022. During this meeting, Ms. Bush and "Lucy" discussed employment opportunities for Ms. Bush at a company called Conduent. Later in the evening, "Lucy" messaged Ms. Bush and told her that she wanted Ms. Bush to meet her supervisor at Conduent in Bentonville, Arkansas, on Monday, October 31, 2022, at 9:00 a.m. At approximately 11:00 p.m., on October 28, 2022, "Lucy" again messaged Ms. Bush and informed her that she would meet Ms. Bush at the Handi-Stop convenience store located in Maysville, Arkansas, on Monday, October 31, 2022, to take Ms. Bush to meet her supervisor at Conduent.

10. On October 31, 2022, Mr. Willis drove Ms. Bush to the Handi-Stop convenience store where Ms. Bush met "Lucy." Mr. Willis noted that "Lucy" was driving the same pickup truck that he had observed on October 28, 2022. At approximately 3:00 p.m., Mr. Willis received a text message from Ms. Bush stating that she was in Gravette, Arkansas, and on her way to the Handi-Stop convenience store where she had arranged to be picked up. Mr. Willis reported to the Benton County Sheriff's Office that while he was waiting for Ms. Bush to arrive, he observed the same older model pickup truck drive past the Handi-Stop convenience store and turn on to Highway 43 and travel north. Mr. Willis was able to observe that Ms. Bush was the passenger in the vehicle

and that "Lucy" was driving. Mr. Willis attempted to contact Ms. Bush by phone but reported that the calls were going to voicemail.

11. On November 1, 2022, Benton County Sheriff's Office detectives met with Mr. Willis in Maysville, Arkansas. During this meeting, Mr. Willis informed the detectives that he had located Ms. Bush's cellular telephone on the side of Highway 43 in Maysville, Arkansas. Mr. Willis directed the detectives to the location where the telephone was located. The detectives recovered the phone and obtained the access code from Mr. Willis. Data obtained from Ms. Bush's cellular service provider indicated that the telephone had been transported from Maysville, Arkansas, to a location in Pineville, Missouri, and then return to Maysville, Arkansas, several hours later.

12. When Benton County Sheriff's Office Detective Simpson returned Mr. Willis to the Handi-Stop convenience store, he was approached by Rick Burrow. Burrow told Detective Simpson that on October 31, 2022, he and Sawyer McGee were traveling south on Highway 43 near Maysville, Arkansas. While driving, he and McGee observed an unknown male subject throw a red and black cellular telephone from the window of his vehicle as the vehicle traveled north on Highway 43. Detective Simpson made contact with McGee who confirmed the information provided by Burrow and added that the vehicle in question was a blue or light gray Chevrolet pickup truck.

13. While reviewing the phone, detectives were able to locate a Facebook account for "Lucy." The account appeared to have been created on October 25, 2022, and the profile name was identified as "Lucy Barrow." Detectives located a public posting on the account that read "I have a bunch of baby items if any moms to be need them."

14. Detective Alison Nguyen with the Benton County Sheriff's Office issued an

emergency request with Facebook, now Meta Platforms Inc, to request records associated with the Facebook profile of Lucy Barrow. Facebook provided information to Detective Nguyen indicating that the Lucy Barrow profile was created on October 25, 2022, at 00:22:45 UTC. The registration internet protocol (IP) address was identified as 2607:fb91:2f08:c891:c431:e452:f173:b495. Detective Nguyen was able to determine that this IP address was owned/maintained by T-Mobile. Detective Nguyen requested an emergency disclosure from T-Mobile and learned that this IP address was assigned to JAMIE WATERMAN, at 1848 Laughlin Ridge Road, Pineville, Missouri. That residence is located approximately .15 miles from a cellular telephone that registered the presence of Ms. Bush's cellular telephone.

15. On October 31, 2022, a call was placed to the McDonald County, Missouri 911, reporting that AMBER WATERMAN was having a medical emergency related to her pregnancy. AMBER WATERMAN met with emergency medical technicians (EMT) at a store located in Longview, Missouri. When AMBER WATERMAN arrived at this location, she provided the EMTs with an unresponsive newborn infant. EMT personnel attempted to revive the infant, but their efforts were unsuccessful. The infant's remains were transported to the Ozark Funeral Home by EMT personnel.

16. On November 2, 2022, personnel with the Benton County, Arkansas medical examiner's office took custody of the deceased infant and transported the deceased infant from the Ozark Funeral Home to Benton County, Arkansas. The deceased infant was later transported to the Arkansas State Crime Laboratory in Little Rock, Arkansas where an autopsy was performed. During the autopsy, medical examiners examined the placenta that was recovered with the deceased infant and determined that a partial uterus and at least one ovary was attached to the placenta. Medical personnel determined that the deceased infant had been removed from the

mother and was not born naturally. DNA from the deceased infant was also collected.

17. On November 1, 2022, Benton County Sheriff's Office detectives arrived at the home of JAMIE and AMBER WATERMAN in connection with the investigation of Ms. Bush's disappearance. While on scene, the detectives noted that a tan Chevrolet pickup truck located on the property contained what appeared to be a large amount of blood within the vehicle.

18. On November 3, 2022, a state search warrant, issued in McDonald County, Missouri, was served at the residence located at 1848 Laughlin Ridge Road, Pineville, Missouri. The search was conducted by members of the McDonald County Sheriff's Office, the Benton County Sheriff's Office, and the FBI. The FBI evidence response team members from the Kansas City and the Little Rock Divisions participated in the search.

19. While the search was being executed, FBI SA Brenan Despain, FBI Task Force Officer Kris Moffit, and Benton County Sheriff's Office Detective Patrick Stuart traveled to JAMIE WATERMAN's place of employment and conducted a non-custodial interview of JAMIE WATERMAN. During this interview, JAMIE WATERMAN advised that on the evening of October 31, 2022, he discovered that there was blood inside the tan colored Chevrolet pickup truck. JAMIE WATERMAN assumed that the blood came from his wife, AMBER WATERMAN, due to her pregnancy complications. When JAMIE WATERMAN questioned AMBER WATERMAN about the blood, AMBER WATERMAN did not acknowledge the source of the blood. JAMIE WATERMAN watched AMBER WATERMAN clean the blood from the pickup truck and thereafter, the rags used to clean the blood were burned in a burn barrel located in front of the residence by AMBER WATERMAN. JAMIE WATERMAN then collected trash from the residence and burned the trash in the same burn barrel.

20. JAMIE WATERMAN stated that when Benton County detectives arrived at his

residence on November 2, 2022, he was aware that Ms. Bush had been reported as missing. JAMIE WATERMAN learned of this through social media coverage. After the detectives left the residence at approximately 5:00 a.m. on Wednesday, November 2, 2022, AMBER WATERMAN informed JAMIE WATERMAN that she had killed Ms. Bush and then quickly changed her story and said that "Lucy" had killed Ms. Bush.

21. At approximately 6:30 a.m., AMBER WATERMAN led JAMIE WATERMAN to Ms. Bush's body. JAMIE WATERMAN stated that the body was clothed and was lying face-down next to a boat next to the house. The body was covered with a blue tarp. AMBER WATERMAN removed a ring from Ms. Bush's finger and rolled the body onto the blue tarp. JAMIE WATERMAN dragged the body on the tarp to a fire pit behind the residence and AMBER WATERMAN asked JAMIE WATERMAN to get gasoline. JAMIE WATERMAN brought a gallon of chainsaw bar chain oil to AMBER WATERMAN. AMBER WATERMAN proceeded to light the tarp and poured about 1/3 of the oil over the body. AMBER WATERMAN then began collecting wood to throw on the fire. JAMIE WATERMAN stated that he dragged a small sofa next to the fire and believes that AMBER WATERMAN put the sofa into the fire. After the fire burned for about one hour, AMBER WATERMAN doused the fire with water from a garden hose and JAMIE WATERMAN removed the body from the burn pile.

22. When JAMIE WATERMAN attempted to move the body, the body was still very hot, so JAMIE WATERMAN went to a shed located on the property and retrieved a new tarp. The tarp was placed next to the body and JAMIE WATERMAN rolled the body onto the tarp.

23. After placing the body on the tarp, the body was moved onto the bed of JAMIE WATERMAN's blue 1993 GMC pickup. The blue 1993 pickup was similar in description to the vehicle observed by witness Sawyer McGee in the vicinity of where Ms. Bush's cellular telephone

was discovered near Maysville, Arkansas. JAMIE WATERMAN and AMBER WATERMAN drove the body to an area within a short distance from their residence. JAMIE WATERMAN stated that his pickup truck was having transmission problems and could not travel far. After arriving at the spot where the body was to be hidden, JAMIE WATERMAN and AMBER WATERMAN removed the body from the bed of his pickup truck and placed it on the ground. AMBER WATERMAN then removed the tarp. JAMIE WATERMAN and AMBER WATERMAN drove back to their residence where AMBER WATERMAN burned the tarp.

24. JAMIE WATERMAN was asked if he could show the interviewers where the body was taken to, and JAMIE WATERMAN agreed. At this time, SA Despain and TFO Moffit seized a cellular phone from JAMIE WATERMAN. JAMIE WATERMAN then led agents and detectives to where he and AMBER WATERMAN had left the body. Upon arrival at this location, a charred human body, later identified as Ashley Bush, was discovered.

25. During the search of the residence located at 1848 Laughlin Ridge Road, the FBI evidence response team members discovered a charred human hand and bone fragments located in a burn pile behind the residence.

26. During the autopsy of Ms. Bush, it was determined that she suffered a gunshot wound to the torso.

27. On December 5, 2022, Benton County Sheriff's Office Detective Susan Matthews provided me with records that were obtained from Meta Inc for Facebook user ID 100087245287695, the "Lucy Barrow" Facebook account. In reviewing these records, I found that on October 31, 2022, at 16:14:48 UTC, the Facebook account was accessed by an unknown user using a Samsung model SM-S111DL cellular telephone, the same make and model as the Target Device.

28. In addition to providing me with records for the "Lucy Barrow" Facebook account, Detective Matthews provided me with Facebook records that were obtained for Facebook user ID 100055710780819, AMBER WATERMAN's Facebook account. In reviewing these records, I found that between September 7, 2022, and October 13, 2022, the Facebook account was accessed by an unknown user using a Samsung model SM-S111DL cellular telephone on four different occasions. This make and model is the same make and model of the Target Device.

29. During the execution of the state search warrant at AMBER WATERMAN's residence on November 3, 2022, members of the FBI evidence response team collected several cellular telephones that were located inside the WATERMAN residence, including the Target Device. As described above, the Target Device is the same make and model as a device that was used to access Facebook accounts used by AMBER WATERMAN and "Lucy Barrow," the fictitious account believed to have been used by AMBER WATERMAN.

## TECHNICAL TERMS

30. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Computer: The term "computer" as defined in 18 U.S.C. § 1030(e)(1), means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

   b. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers,

Page 9 of 16

Case 6:22-sw-02182-DPR   Document 1-1   Filed 12/27/22   Page 9 of 16

enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

c. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

d. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable

Page 10 of 16

Case 6:22-sw-02182-DPR   Document 1-1   Filed 12/27/22   Page 10 of 16

storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

  e. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

  f. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments. or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal

Case 6:22-sw-02182-DPR   Document 1-1   Filed 12/27/22   Page 11 of 16

computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

  g.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

  h.  Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

  i.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

  j.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections

Case 6:22-sw-02182-DPR   Document 1-1   Filed 12/27/22   Page 12 of 16

between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

31. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, computer, digital camera, portable media player, GPS, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

32. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

33. There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

  b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

  c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

  d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

34. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

  a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

35.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

36.  *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

37.  Based on the above facts, this affiant believes probable cause exists for the issuance of a warrant to search the Device described more fully in Attachment A for (1) property that constitutes evidence of the commission of a criminal offense; (2) contraband, the fruits of a crime, or things otherwise criminally possessed; and/or (3) property designated or intended for use or which is or has been used as the means of committing a criminal offense, namely possible violations of 18 U.S.C. §§ 1201(a) and 3, including, but not limited to, the items listed in Attachment B.

Further Affiant Sayeth Naught.

STACY LEE MOORE
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me via telephone on the ___27th___ day of December 2022.

HONORABLE DAVID P. RUSH
Chief United States Magistrate Judge
Western District of Missouri

Page 16 of 16

Case 6:22-sw-02182-DPR   Document 1-1   Filed 12/27/22   Page 16 of 16